SIGNED THIS: May 22, 2012

_____
**Thomas L. Perkins
United States Chief Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

IN RE: )
)
T.A. BRINKOETTER & SONS, INC., ) Case No. 09-80727
)
      Debtor. )
)
)
CHARLES E. COVEY, Trustee )
)
      Plaintiff, )
)
vs. ) Adv. No. 11-8054
)
SOY CAPITAL BANK AND TRUST )
COMPANY, )
)
      Defendant. )

O P I N I O N

This matter is before the Court on the motion for summary judgment filed by Charles E. Covey (TRUSTEE), as Chapter 7 Trustee for the estate of the Debtor, T.A. Brinkoetter & Sons, Inc. (Debtor), on the amended complaint filed by the TRUSTEE against Soy Capital Bank and Trust Company (BANK), seeking to recover the sum of $59,944.62,

transferred to the BANK during the time the Debtor operated as a debtor in possession under chapter 11 of the Bankruptcy Code, pursuant to section 549 of the Bankruptcy Code.

## FACTUAL BACKGROUND

The Debtor, an electrical and plumbing contractor, filed a chapter 11 petition on March 10, 2009. At the time of the filing, the Debtor had become delinquent in paying its tax obligations to the tune of $1.6M and the BANK, its major secured lender, had exercised its right of setoff against the Debtor's operating account, seizing funds in excess of $350,000.[1] As a result, the Debtor was left without sufficient working capital. According to its schedules, the Debtor held accounts receivable totaling $1.5M at the time of filing.

On March 16, 2009, by agreement, an order was entered permitting the Debtor to use cash collateral and its present inventory, and granting the BANK and the IRS replacement liens against the postpetition receivables. The order did not resolve the issue of priority between the BANK and the IRS. Attempting to keep its business going, the Debtor assumed several contracts on projects which had not been completed as of the bankruptcy.

The Debtor scheduled in excess of seventy vehicles it owned, mostly vans and pickup trucks, all subject to liens. It did not file a motion dealing with the surrender of any vehicles or the payment of adequate protection payments. In response to stay relief motions by Busey Bank and GMAC, the Debtor agreed to make monthly adequate protection payments in the regular contract amount for its continued possession and use

---

[1] Claim #45-3, filed by the Internal Revenue Service on June 15, 2011, listed a secured claim for $972,665.45 for withholding taxes, an unsecured priority claim of $559,483.05 for withholding and unemployment taxes, and a general unsecured claim for $73,047.22.

2

of several vans and pickup trucks. No adequate protection order was entered with respect to the BANK.

The BANK, holding a mortgage against the Debtor's real estate in addition to five separate claims secured by two 2006 Chevrolet C1500 pickup trucks, two 2007 Chevrolet C1500 pickup trucks and a 2006 Chevrolet G30 van, filed the following proofs of claims on July 16, 2009:

| Claim No. | Collateral | Monthly Payment | Balance Due at Filing | Postpetition Payments |
|---|---|---|---|---|
| 128 | 2006 Chev C1500 | $ 470.81 | $ 2,351.82 | $ 470.81 |
| 129 | 2006 Chev C1500 | 482.56 | 3,349.41 | 967.56 |
| 130 | 2006 Chev Van | 740.37 | 4,402.61 | 1,490.00 |
| 131 | 2007 Chev C1500 | 200.51 | 1,768.37 | 401.22 |
| 132 | 2007 Chev C1500 | 424.81 | 16,393.00 | 846.29 |
| 135 | Mortgage Note | 3,417.86 | 354,622.75 | -0- |
| 137 | Mortgage, equipment | | 1,250,015.76 | -0- |
| 138 | Mortgage, equipment | | 890,407.76 | -0- |

In the claims, the BANK estimated the aggregate value of the five vehicles as $30,500.

The Debtor's records show the following postpetition payments made in 2009 to the BANK:

| Date | Amount |
|---|---|
| June 22, 2009 | $2,315.64 |
| July 28, 2009 | 7,217.12 |
| September 18, 2009 | 3,546.16 |
| October 10, 2009 | 822.51 |
| November 19, 2009 | 621.90 |
| December 3, 2009 | 421.29 |

The payments were all made voluntarily without court order. The Debtor's records do not reflect how the postpetition payments were intended to be applied. The record before the Court is incomplete as the Court is unable to reconcile the discrepancy in postpetition

3

payments reflected in the BANK'S proofs of claim versus the Debtor's records. It is not clear which debts the Debtor was intending to make payments on or which debts the payments were credited to by the BANK, although the parties appear to assume that some or all of the payments were applied to the vehicle loans.

Meanwhile, in September, 2009, the Debtor proposed to sell substantially all of its assets pursuant to section 363 of the Bankruptcy Code, to SARS, a corporation that had merged with the Debtor's former shareholders, subject to its obtaining financing and the finalization of certain negotiations, with SARS agreeing to act as a stalking horse bidder with a bid of $2M. The Debtor's attempts to formalize the sale continued for several months. At a hearing on November 10, 2009, the Debtor represented that the proposed purchaser continued to work on securing financing and that its investment banker had accountants conducting a due diligence audit of the Debtor's books. The Debtor advised that SARS intended to pay off the BANK in the first stage of financing, after which the Debtor would file an asset purchase agreement and motion for auction procedures.

The BANK filed a motion for relief from the stay on November 23, 2009, alleging that the balance due on the loan secured by the 2007 pickup was $14,287.25, that a balance of $527.58 was due on one of the loans on a 2006 pickup, but that the balances on the remaining vehicle loans had been paid. The BANK further alleged that the mortgage and the vehicles also secured a term note and a line of credit note with outstanding balances in excess of $2M. The Debtor opposed the relief sought, noting that the BANK had worked out an agreement in principle with corporate entities related to the Debtor to pay the BANK'S obligations in full and requesting additional time to obtain the necessary

4

financing. At the hearing, the Debtor maintained that the vehicles were necessary to its business, stating its willingness to make back payments on the loans. The Court granted the BANK'S motion over the Debtor's objection, and an order was entered on December 22, 2009, which became effective on January 1, 2010. The order modified the automatic stay to permit the BANK to foreclose its mortgage on the Debtor's real estate and to repossess and sell the four pickup trucks and the van. Neither the BANK'S motion nor the order makes any reference to adequate protection payments. Shortly thereafter, the BANK and the Debtor reached an agreement pursuant to which the Debtor paid the BANK $45,000 on January 14, 2010, in consideration of which the BANK released its lien on the titles to the five vehicles. Neither the BANK nor the Debtor filed a motion seeking approval of the transaction.[2] The BANK instituted foreclosure proceedings against the real estate and the Debtor relocated its operations.

On January 26, 2010, the IRS moved to dismiss or convert the case, based on the Debtor's failure to pay postpetition payroll taxes of $624,232.11. At a hearing held on February 22, 2010, the Debtor informed the Court that the section 363 sale to SARS had been delayed and that the Debtor was undergoing audits by the investment banker hired by SARS. SARS advised the Court that it had determined that the best approach would be a joint plan of liquidation. On March 15, 2010, SARS filed a plan of reorganization in which it proposed to redeem the real estate by paying off the BANK'S mortgage via refinancing, and in which it proposed to attempt to avoid the BANK'S liens in certain personal property

---

[2] From the Court's perspective, the Debtor was a loose cannon while acting as a debtor in possession, not well-controlled by counsel.

5

(not including the five vehicles previously released). In a subsequently filed disclosure statement, SARS represented that the BANK and the Debtor "reached an accord" whereby the Debtor paid off the five vehicle loans and obtained title to the vehicles free and clear of the BANK'S liens. SARS reiterated the earlier assertion that the BANK'S security interest in receivables, inventory and equipment might be avoidable and, alternatively, that its interest in receivables might be subordinate to the IRS tax lien.

For the next eight months the confirmation process dragged on based upon continuing promises by SARS. In early May, 2011, noting that progress had again been stymied and that the recent hearings were little but a replay of the same broken record, and because all of the Debtor's creditors then favored conversion of the case, the Debtor and SARS were put on a short leash. The Debtor was given until June 3, 2011, to file a letter of commitment for financing, absent which, the case would be converted on June 6, 2011. The Debtor was unable to meet the deadline, and the case was converted to chapter 7 on that date.

The TRUSTEE filed this adversary proceeding pursuant to section 549 seeking to recover allegedly unauthorized payments totaling $59,944.62, which were made to the BANK after the filing of the chapter 11 petition. The BANK contends that the payments are not avoidable, asserting that the payment of $45,000 made by the Debtor in January, 2010, was for the purchase of the five vehicles on which it held perfected liens and which had a market value of $70,000 to $80,000 at that time. As an affirmative defense, the BANK maintains that the payments were made to the BANK in the ordinary course of the Debtor's business and fairly compensated the BANK for its continued use of those vehicles. The TRUSTEE filed a motion for summary judgment. After a hearing, the Court took the

matter under advisement.

## ANALYSIS

Section 549(a) permits the trustee to avoid a postpetition transfer of property "that is not authorized under this title or by the court." 11 U.S.C. § 549(a). Rule 6011 of the Rules of Bankruptcy Procedure provides that the entity asserting the validity of a transfer under section 549 has the burden of proof. Rule 4001(d) provides a procedure for a motion for approval of an agreement to provide adequate protection.

Pursuant to sections 1108 and 363(c)(1) of the Bankruptcy Code, a debtor in possession who is authorized by section 1108 to operate the debtor's business, is authorized to make expenditures "in the ordinary course" of operation without notice, hearing, or court order. As applied in chapter 11 cases, the policy allowing unauthorized transfers to be avoided and recovered protects the estate against unnecessary diminishment of its assets. The exception for ordinary business transactions presumes benefit or value accruing to the estate.[3] Proof that the estate received fair value is usually sufficient to insulate a postpetition payment from avoidance under section 549.

A prepetition debt that is unsecured is not properly payable by a debtor in possession, even if the debtor in possession holds a good faith, reasoned belief that it is in the best interest of the reorganizing business to pay it. *In re Kmart Corp.,* 359 F.3d 866 (7th Cir. 2004) (rejecting the payment of unsecured claims to "critical vendors"). The TRUSTEE argues that a chapter 11 debtor is not authorized to make adequate protection payments

---

[3] Implicit in the ordinary transaction exception is the standard that holds management to the exercise of sound business judgment and compliance with the usual trio of duties of due care, loyalty and good faith. A breach of any of these duties likely indicates that the transaction is not ordinary.

7

to a prepetition secured creditor without approval of the court. Characterizing the installment payments made through December, 2009, as ordinary and necessary in the Debtor's conduct of its business operations, the BANK asserts that the monthly operating reports filed by the Debtor which clearly identified each of the payments to the BANK as having been made on the vehicle loans, provided ample notice to creditors of the bankruptcy estate. The BANK further maintains that the value of the vehicles was approximately $70,000 to $80,000 at the time it agreed to accept $45,000 from the Debtor for the release of its liens so that it gave more than fair value to the estate. The BANK asserts that if the payments are avoided, it is entitled to have its liens restored.

While the automatic stay preserves the *status quo* for the benefit of debtors, adequate protection is intended to preserve the *status quo* for secured creditors, specifically by protecting a secured creditor from erosion of its relative secured status due to depreciation in the value of its collateral while the automatic stay is in place. *In re Good*, 428 B.R. 235, 241-42 (Bankr.E.D.Tex. 2010). If collateral is depreciating, the secured creditor, absent a significant equity cushion, is entitled to cash payments or additional security in the amount of the decline. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 370, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988). Lack of adequate protection is grounds for termination of the automatic stay, 11 U.S.C. § 362(d)(1).

A chapter 11 debtor in possession is authorized to operate its business, 11 U.S.C. § 1108, and may enter into transactions and use property of the estate in the ordinary course of business without notice or hearing, 11 U.S.C. § 363(c)(1). Court approval after

notice and a hearing is necessary before a debtor in possession may use property of the estate other than in the ordinary course of business. 11 U.S.C. § 363(b)(1). In furtherance of the rehabilitative purpose of chapter 11, a debtor in possession is allowed to operate its business within the broad parameters of sound business judgment, and is authorized and required to pay debts incurred in the ordinary course of business. *In re Taub,* 427 B.R. 208, 224 (Bankr.E.D.N.Y. 2010); *In re Funding Systems Asset Management Corp.,* 72 B.R. 87, 88 (Bankr.W.D.Pa. 1987). As explained in COLLIER ON BANKRUPTCY, ordinary course transactions are intended to be conducted without notice to creditors and without prior court approval, and are insulated by their ordinariness from subsequent avoidance under section 549.

> Although the Code vests broad operating authority in trustees and debtors in possession, their discretion is not completely unfettered. Section 363(b) provides that a trustee or debtor in possession may enter into transactions, including the use, sale or lease of property, *other than in the ordinary course of business* only after notice and a hearing. As a practical matter, this means that creditors and other parties in interest, particularly the creditors' committee and other appointed committees, may have the opportunity to appear and question or oppose these non-ordinary course of business transactions and that courts will have an opportunity to scrutinize them. If a non-ordinary course transaction is undertaken without notice and hearing, it may be avoided under section 549(a)(2)(B) of the Code. The purpose of section 363(b) is not to "straightjacket" trustees and debtors in possession and "prevent [them] from responding quickly to normal business demands." Nor is it to get courts involved in "micro managing" day-to-day business affairs. Rather, the purpose is to give trustees and debtors in possession the flexibility to engage in ordinary transactions without judicial oversight, while protecting creditors and other parties in interest by giving them the opportunity to be heard when transactions are out of the ordinary and could materially affect their interests. (Citations omitted).

7 COLLIER ON BANKRUPTCY ¶ 1108.02[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

The TRUSTEE contends that the postpetition payments made by the Debtor to the BANK were not made in the ordinary course of business, under either the vertical or horizontal tests developed by courts. COLLIER explains these tests as follows:

> To determine whether a particular transaction or use of property is or is not within the debtor's ordinary course of business, courts have developed two tests. The first is the so-called "vertical" or "creditor's expectation" test, which requires the court to determine whether a transaction subjects creditors to economic risks different from those bargained for when credit was extended. The "touchstone of ordinariness" in this context is whether the transaction is one that creditors could reasonably have expected the debtor to enter into in the normal course of its business. The second is the so-called "horizontal" test, which requires the court to consider whether the transaction is of a type commonly undertaken by companies involved in business activities that are the same as or similar to the debtor's.

*Id.*

The TRUSTEE does not claim that the Debtor's purchase of and payment for the five vehicles used in its business, when viewed outside of the context of bankruptcy, is not ordinary. Instead, he relies on the failure to obtain an adequate protection order as the source of non-ordinariness. He argues that creditors would have expected prior notice of all proposed adequate protection payments, thus rendering the payments made without notice non-ordinary.[4]

Perhaps because debtors don't usually make voluntary adequate protection payments without the protection of a court order, there is a dearth of caselaw as to whether such payments can be considered ordinary. The TRUSTEE believes they cannot and that the lack of an order renders them avoidable on that basis alone. In this Court's view, the

---

[4] To the extent the payments in question were intended to be adequate protection payments, they could have been inoculated against subsequent avoidance via a motion to approve an agreement for adequate protection. Such a motion not having been filed, however, the BANK is forced to prove, defensively, that the payments were ordinary under section 1108 and, in addition, that the failure to procure an adequate protection order is not fatal *ipso facto.*

TRUSTEE conflates ordinariness under section 1108 and the business judgment standard, with regularity under the rules of bankruptcy procedure, which are separate and unrelated issues. Both the vertical and horizontal tests for ordinariness focus on whether the debtor's transaction with the creditor is usual in the context of the debtor's business. It is undisputed that a contractor's installment purchase of pickup trucks and a van for use in its business is a transaction commonly undertaken by similar companies (horizontal test) and is one that creditors would reasonably have expected the debtor to enter into in the normal course of its business (vertical test).

The primary case relied on by the TRUSTEE is *In re Miller Min., Inc.*, 219 B.R. 219 (Bankr.N.D.Ohio 1998), where the court's analysis turned on whether the payment was made by the debtor in the ordinary course of its business and whether the payment received by the secured creditor was its cash collateral. As to the first question, the Court ruled that court authorization is required before adequate protection payments can be made and that such a payment made by the debtor, without first providing notice to creditors and obtaining the necessary approval, cannot be considered as having been made in the ordinary course of the debtor's business.

Contrary to the TRUSTEE'S assertion, not all courts agree with that result. Other courts have viewed periodic payments made by a debtor to remain current on secured debt as reasonable operating expenses that are necessary for the continuation of the debtor's business. *In re Discount Family Boats of Texas, Inc.*, 233 B.R. 365 (Bankr.E.D.Tex. 1999); *In re Family Health Food U.S.A. Inc.,* 223 B.R. 250 (Bankr.S.D.Fla. 1998); *Matter of Ford*, 61 B.R. 913 (Bankr.W.D.Wis. 1986). The failure to obtain court authorization for the making of

adequate protection payments is regarded as a technical default, which need not necessarily be "undone." *See In re EDG Holdings, Inc.*, 438 B.R. 154 (Bankr.S.D.Ill. 2010).

The TRUSTEE correctly raises the concern that without a motion, creditors are not put on notice of the proposed payments and have no opportunity to object. While the Court shares this concern, the lack of notice does not necessarily render the transfers avoidable. First, this is not a situation where unsecured creditors had a direct property interest in the transferred funds. At most, their interest was indirect in the sense that scarce funds spent by a debtor for one purpose are not then available for other purposes. Imprudent expenditures by an impecunious debtor decrease the chances of a successful reorganization. Second, as pointed out by the BANK, the payments were disclosed on the Debtor's monthly operating reports, so the United States Trustee (UST), if not other creditors, had notice of them. With no unsecured creditors committee appointed, the UST takes a more active oversight role.

Third, adequate protection disputes ordinarily arise when secured creditors are not receiving payments or claim the debtor is not willing to pay a sufficient amount to offset the depreciation. It rarely occurs that an objection is asserted by or on behalf of other creditors on the grounds that the debtor is proposing to pay more than is necessary to adequately protect a secured creditor, especially where, as here, the regular contract payment apparently determined the amount of the adequate protection payment. Yet that argument is what the TRUSTEE'S substantive position comes down to – that unsecured creditors were deprived of the opportunity to object to the payments as excessive. But that argument may yet be made in the context of this section 549 action. So the procedural

oversight of not having a motion filed and noticed to authorize adequate protection payments to the BANK has not resulted in loss of the substantive challenge. Thus, under the circumstances presented here, the lack of a motion and order should not result in the *per se* avoidability of the payments.

Moreover, a security interest is a property right that has always enjoyed a special protected status under the bankruptcy laws. *In re Treco,* 240 F.3d 148, 159-60 (2nd Cir. 2001). The Bankruptcy Code utilizes the concept of adequate protection to preserve the interests of secured creditors in property in which they have a security interest. *In re Blackwood Associates, L.P.,* 153 F.3d 61, 68 (2nd Cir. 1998). The Bankruptcy Code establishes that a secured creditor's interest may only be diminished to the extent that the secured creditor waives its right to the protections afforded by the Code. *Id.* The concept of waiver is implicit in those cases that hold that a secured creditor's right to begin receiving adequate protection does not arise until the creditor files a motion requesting such relief. *See, e.g., In re Big3D, Inc.,* 438 B.R. 214 (9th Cir.BAP 2010); *In re Brian Wise Trucking, Inc.,* 386 B.R. 215 (Bankr.N.D.Ind. 2008).

The BANK filed its motion for relief from the automatic stay on November 23, 2009, several months after the Debtor began making its voluntary payments to the BANK. But the BANK is not claiming an entitlement to pre-motion adequate protection payments that the Debtor failed to make. This distinction makes waiver inapplicable. While a secured creditor who is not receiving payments can be considered to have waived that right until a motion is filed, a creditor who is receiving payments can be considered to have waived only the right to claim that the amount or frequency of the payments should have been

13

greater. Effectively, the creditor is stuck with what he got and cannot later ask for more.[5] The BANK is seeking merely to retain what it received and is not asking for more.

So the TRUSTEE'S contention that the failure to obtain an order authorizing the 2009 payments, by itself, renders the payments unauthorized, and thus avoidable, must be rejected. The inquiry into the ordinariness of the payments and their propriety as adequate protection may now be conducted. It is important to note that since a debtor in possession's payment of a prepetition unsecured debt is never proper (at least in the Seventh Circuit after its *Kmart* decision), and thus is always avoidable under section 549, the only way that the postpetition payments made in 2009 on the BANK'S secured debts may be defended is if they were proper as adequate protection payments.

The $45,000 payment made in January, 2010, requires a different analysis since it was not intended to be an adequate protection payment. The evidence indicates that the Debtor intended to redeem or purchase the release of the five vehicles from the BANK'S security interest and that the BANK did, in fact, release its liens on those titles. Whether this transaction was ordinary under the vertical and horizontal tests cannot be determined on the record before the Court. If not ordinary, the BANK contends that it provided more than equivalent value to the Debtor, thereby benefitting the estate, by "selling" the vehicles to the Debtor for less than fair market value. Whether the BANK gave fair value to the estate when it released its liens on the titles in exchange for the payment depends upon the fair market value of the vehicles at that time, a question of fact that remains to be resolved.

---

[5] This principle is reflected in those cases that hold that a superpriority claim under section 507(b) for inadequacy of adequate protection is predicated upon the express granting of adequate protection by court order. *See, e.g., In re James B. Downing & Co.,* 94 B.R. 515, 520 (Bankr.N.D.Ill. 1988).

14

The BANK contends that even if the transfers are avoided, it must be restored to its status as a secured creditor. In effect, the TRUSTEE would treat the BANK as if it were a prepetition unsecured creditor that had received postpetition payments without any justification, which is not at all what happened here. The BANK, through its participation in the Chapter 11 proceeding, should not be relegated to the status of an unsecured creditor.[6] Because the TRUSTEE'S motion, premised on the absence of an adequate protection order, must be denied, it is not necessary to determine today exactly how the BANK is to be treated if avoidance of some or all of the transfers is permitted. If avoidance is denied, those issues will be moot.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###

---

[6]The Court is mindful of the possibility that the BANK was lulled into complacency by the Debtor's voluntary payments. The BANK could have perceived no need to file a motion demanding payments that it was already receiving.